UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff/Respondent, | ) | Criminal Action No. 6: 13-030-DCR |
| | ) | and |
| V. | ) | Civil Action No. 6: 16-130-DCR |
| | ) | |
| JOHN THOMPSON, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant/Movant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

John Thompson has a problem telling the truth. When he chose to testify about the quantity of drugs he was peddling, he lied. And because of that lie, he received an enhanced sentence for obstruction of justice and lost credit for acceptance of responsibility. Not a good decision on his part.

Thompson tells another tale through his § 2255 motion: his defense counsel supposedly was engaged in an illicit-fee-agreement relationship with a government witness. He argues that, because of this alleged relationship, counsel had an actual conflict of interest and his guilty plea should be vacated. But the truth has a way of creeping in. There was no such "fee agreement," there is no evidence of an illicit relationship, and the government's witness was never a government's witness. Finally, perhaps expecting his conflict-of-interest story to crumble with adversarial testing, Thompson makes a new claim. For the first time, he asserted while testifying at the evidentiary hearing that counsel told him to lie about the quantity of drugs. The United States Magistrate Judge found the

latest claim lacking in credibility and the undersigned agrees completely. In short, Thompson's claims lack evidentiary support and his § 2255 motion will be denied.

**I.**

On November 15, 2013, Thompson pleaded guilty to one count of conspiring to distribute oxycodone and one count of distributing oxycodone, in violation of 21 U.S.C. § 846 and § 841(a)(1). [Record Nos. 20, 97] In light of a factual dispute over the quantity of pills in issue, an evidentiary hearing was held on January 10, 2014. [Record No. 102] In findings published on January 13, 2014, the Court found defendant Thompson to have received a total of 8,750 oxycodone 30 milligram pills over the course of the conspiracy, despite Thompson's testimony alleging a much smaller quantity.[1] [Record No. 104] Thompson was sentenced on March 28, 2014, to 190 months' incarceration, followed by a three-year term of supervised release. [Record Nos. 138 and 139]

In light of Thompson's false testimony during the evidentiary hearing, the defendant did not receive credit for acceptance of responsibility in connection with his non-binding guideline calculation. [*See* Record No. 154.] Instead, he received a two-level *increase* for obstruction of justice. [*Id.*] Thompson appealed his sentence, challenging the Court's drug-quantity findings, along with his obstruction enhancement and denial of acceptance

---

[1] This quantity included as many as 600 pills per week during the course of the conspiracy, despite Thompson's testimony that he never received more than 90 pills per week. [Record No. 104 at 4-5] The Court did not find Thompson's testimony credible, but instead found that it was offered in an attempt to incorrectly reduce his guideline sentencing range. [*Id.* at 5]

credit. [*See* Record Nos. 140 and 171.] The Sixth Circuit later affirmed [Record Nos. 171 and 172] and on June 22, 2015, the Supreme Court denied the defendant's petition for a writ of certiorari. [Record No. 188]

Exactly one year later, Thompson filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.[2] [Record No. 202] Thompson alleges six theories of ineffective assistance of counsel. His primary claim was that his then-defense counsel, Warren Scoville (now deceased), had an actual conflict of interest. In accordance with local practice, this motion was referred to United States Magistrate Judge J. Gregory Wehrman for initial consideration. A briefing order was set, and response and reply briefs were filed. [Record Nos. 204, 211, 215]

On September 29, 2016, Magistrate Judge Wehrman issued a Report and Recommendation concluding that the Thompson's motion should be denied. [Record No. 217] Magistrate Judge Wehrman found that "most of defendant's claims are too generic and conclusory to warrant §2255 relief." [*Id.* at 4] However, with respect to counsel's alleged conflict of interest, Magistrate Judge Wehrman concluded that Thompson's did not meet "his steep burden to show deficient performance and/or prejudice," especially in light

---

[2] The motion's penultimate page is signed and dated June 22, 2016. [Record No. 202 at 10] The certificate of service is on the final page of the document, but is not separately signed. [*Id.* at 11] The envelope is not postmarked. [*See* Record No. 202-2] It was mailed from the Federal Correctional Institution in Butner, North Carolina, and docketed on June 30, 2016. [*Id.*] Despite the government's suggestion of untimeliness, the Magistrate Judge found a lack of sufficient basis to doubt the timelines of the motion under the mailbox rule. [*See* Record No. 217 at n.1.] Despite an unsigned final page, the Court agrees.

of the shaky evidentiary basis presented. [*Id.* at 8] Thompson filed objections to the Magistrate Judge's Report and Recommendation, signed and dated October 18, 2016, which were filed in the record on October 24, 2016. [Record No. 220] The objection strenuously asserts that counsel had an *actual* conflict of interest. [*See, e.g., id.* at 6.] Thompson included a purported affidavit of "Brooke Williams" together with his objections. [Record No. 220-1] Because that affidavit tended to support Thompson's allegation of an actual conflict, the Court referred the matter back to the Magistrate Judge for further consideration, including to consider the applicability of *Cuyler v. Sullivan*, 446 U.S. 335 (1980). [Record No. 225]

Thompson was appointed counsel and an evidentiary hearing was scheduled based on the newly-filed affidavit. [Record No. 232] The evidentiary hearing was held before Magistrate Judge Wehrman on March 23 and 34, 2017. [*See* Record Nos. 250-254.] Testimony was taken from Thompson as well as from both individuals from whom affidavits were submitted. [*Id.*] A Report and Recommendation was issued thereafter. [Record No. 255] Magistrate Judge Wehrman recommends denial of Thompson's motion for lack of evidence of an actual conflict. [*Id.*] Objections were timely filed by counsel.[3]

---

[3] On April 14, 2017, the Court received a letter from the defendant's wife, Sabrina Thompson, voicing concern that the defendant had been unable to "be part of the objections" because he had recently been transferred among numerous facilities and was unable to obtain a copy of the objections or speak with his attorney. [Record No. 257] Ample time has since passed and the Court has heard nothing further from Thompson, nor has permission been sought to amend his objections. In the absence of a more specific request or concern, the Court

[Record No. 256] The objections assert in a cursory fashion that the Report and Recommendation is wrong regarding concurrent representation of Thompson and his co-defendant Osborne. Thompson argues that there was concurrent representation (Scoville represented Osborne on state charges while representing Thompson on federal charges), that it occurred at a critical stage, and that Scoville's loyalty was divided because of his desire to have an affair with Osborne's fiancé (and alleged government witness): Brooklyn Williams. [*Id.*] The objections further argue that Scoville's advice was tainted and that the Report and Recommendation fails to consider the allegation that Scoville instructed Thompson to lie about the pill quantity (which, it alleges, is strong evidence of unethical and constitutionally ineffective assistance). [*Id.*]

This Court must make a *de novo* determination of those portions of the Magistrate Judge's recommendation to which objections are made. 28 U.S.C. § 636(b)(1)(C). However, "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Nevertheless, the Court has examined the record *de novo* and agrees with the Magistrate Judge that denial is appropriate.

---

has no basis to doubt that Thompson is satisfied with the representation provided by his present counsel (and with the substance of the objections).

**II.**

As ably explained in the Report and Recommendation, a defendant claiming ineffective assistance of counsel must typically show "(1) that his or her attorney 'made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment,' and (2) that the attorney's deficient performance was so prejudicial that it 'deprive[d] the defendant of a fair trial, a trial whose result is reliable.'" *Harris v. Carter*, 337 F.3d 758, 761 (6th Cir. 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). This is known as the *Strickland* standard: errors and prejudice. However, the Supreme Court has recognized exceptions to the *Strickland* standard. Under certain scenarios, defendants are relieved of their burden to show prejudice. *See Mickens v. Taylor*, 535 U.S. 162, 176 (2002) (explaining the exceptions as a "needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel."). One such scenario, typified by the case of *Cuyler v. Sullivan*, 446 U.S. 335 (1980), is where counsel is laboring under a conflict of interest. Where a defendant can show that "an actual conflict of interest adversely affected his lawyer's performance," a defendant need not show prejudice.[4] *Id.* at 348. The confusion lies in what *types* of conflicts of interest the lower *Cuyler* standard applies.

---

[4] Under *United States v. Cronic*, 466 U.S. 648, 658-59 (1984), the presumption of prejudice also arises in circumstances where: "(1) there exists a complete denial of counsel or a denial of counsel at a critical stage of the defendant's trial; (2) defense counsel fails to subject the prosecution's case to meaningful adversarial testing; or (3) counsel is called upon to render assistance where competent counsel very likely could not." *See Moss v. United States*, 323 F.3d 445, 455 (6th Cir. 2003) (internal quotation marks omitted). A *Cronic* claim has been

- 6 -

In *Mickens v. Taylor*, 535 U.S. 162 (2002), the Supreme Court suggested, without deciding, that *Cuyler* may only apply to scenarios where counsel can be shown to have "actively represented conflicting interests." *Id. at* 175 (quoting *Cuyler*, 446 U.S., at 350). While the Sixth Circuit has trimmed its application of *Cuyler* in light of *Mickens*, in 2003 the Court applied *Cuyler* to a scenario where counsel had represented a co-defendant during the pre-indictment stage, and proceeded to represent the defendant during trial, in the same action. *Moss v. United States*, 323 F.3d 445 (6th Cir. 2003). However, the Court denied relief, finding no adverse effect. *Id.* at 470.

Thompson argues ineffective assistance of counsel both based on the dual representation of him and his co-defendant Michael Osborne, and based on counsel's alleged illicit relationship with Osborne's fiancé (Shannon "Brooke" or "Brooklyn" Williams, a potential government witness). The Court finds that, regardless of the standard applied, Thompson cannot prevail on his conflict of interest claim.

### a. Conflict of Interest Based Upon Concurrent Representation

Warren Scoville was a prominent defense attorney for years preceding his death and, without question, represented both John Thompson and Michael Osborne (Osborne being a co-defendant in the underlying criminal case). However, he did not represent them in the same proceeding. Scoville represented Osborne in a state-court proceeding, and later

---

labeled "per se" ineffective assistance. *See Hunt v. Mitchell*, 261 F.3d 575, 577 (6th Cir. 2001). Thompson does not assert a complete absence of counsel or a *denial* of counsel during a critical stage.

represented Thompson on unrelated federal charges.[5] Osborne's state-court charge was dismissed on August 19, 2013, as established during the evidentiary hearing. [*See* Record No. 255 at 3] Thompson and Osborne were indicted on federal charges on August 22, 2013 [Record No. 20], and were arraigned on August 28, 2013 [Record Nos. 39 and 40]. Thompson retained Scoville as counsel, in anticipation of the federal charges, on June 26, 2013. [Record No. 255 at 2] Therefore, Scoville provided concurrent representation, but only "off-the-record." [Record No. 255 at n.6]

Despite the period of concurrent representation, the Report and Recommendation concludes that *Cuyler* does not apply because "*Cuyler* covers only cases of 'joint representation at trial.'" [Record No. 255 at 11 (quoting *Benge v. Johnson*, 474 F.3d 236, 244 (6th Cir. 2007))] As a gloss on "joint representation at trial," the Report and Recommendation also concludes that, because Scoville did not jointly represent Osborne and Thompson during a "critical stage" of Thompson's proceedings, *Cuyler* does not apply. [*Id.*] There is no suggestion of interactions with prosecutors or law enforcement prior to Thompson being indicted, hence no arguable "critical stage."[6]

Thompson argues in his objections "the concurrent representation *did* occur at a critical stage of [his] proceedings." [Record No. 256 at 2 (emphasis added)] He does not

---

[5] Thompson stipulates that the charges were unrelated. [Evid. Hrg. Tr. 03/23/17 at 53-54]

[6] While the term "critical stage" is used in *Cronic*, 466 U.S. 648, *see* n.4, *supra,* Magistrate Judge Wehrman did not apply *Cronic*. He instead uses that term only as a meaningful reference point.

further elaborate on what counts as a "critical stage."[7] [*Id.*] Neither will the Court elaborate, because adopting the "critical stage" language under *Cuyler* created a potential conflict under existing Sixth Circuit caselaw. In *Moss*, the Sixth Circuit applied *Cuyler* based on pre-indictment representation of co-defendant, but never opined on whether the pre-indictment period contained a "critical stage." 323 F.3d 445. More recent cases, applying *Cronic*, have found pre-indictment stages *not* to be critical stages. *See Kennedy v. United States*, 756 F.3d 492, 493 (6th Cir. 2014) (holding that *pre*-indictment plea negotiations, together with pre-indictment interrogations and pre-indictment identifications, are not "critical stages"). But no definitive answer is necessary here. Regardless of whether Thompson must show prejudice (*Strickland*) or adverse effect (*Cuyler*), he can show neither based upon only the fact of the off-the-record concurrent representation. As Magistrate Judge Wehrman states, "[t]here is no evidence that Scoville altered his representation of Thompson in the federal drug case in any way because of his representation of Osborne. . ." [Record No. 255 at 13] The state court drug proceeding was wholly unrelated to the federal prosecution. [*See id.* at 1-2; Evid. Hrg. Tr. 03/23/17 at 53-54] The representation-conflict nexus is the alleged illicit fee agreement.[8] Without the alleged fee agreement, Thompson's claim largely evaporates.

---

[7] This objection could rightfully be stricken as insufficient. *See Howard v. Secretary of HHS*, 932 F.2d 505, 508-09 (6th Cir. 1991).

[8] It is worth nothing that Thompson argues that Scoville's "tainted advice and counsel began as early as [his] initial appearance, through his proffer and into the sentencing phase." [Record No. 256 at 2] Therefore, he alleges no adverse impact during the time of the actual concurrent representation. By the time of Thompson's initial appearance, Osborne's state-

### b. Conflict of Interest Based Upon Relationship with Government Witness

The gravamen of Thompson's claim is not that joint or concurrent representation with Osborne, in and of itself, created a conflict of interest. It is, instead, that Scoville had an illicit-fee-agreement relationship with Osborne's then-girlfriend, Shannon Brooklyn Williams, who was a likely government witness against Thompson. Thompson previously submitted an affidavit, purportedly sworn to by Williams, that was suggestive of such an agreement. [Record No. 220-1]

The purported Williams affidavit was, in large part, the trigger for the evidentiary hearing in this matter. *See Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir.1996)) ("An evidentiary hearing is required unless 'the record conclusively shows that the petitioner is entitled to no relief.'"). The purported-affidavit suggests, at the very least, that Scoville proposed that Williams provide him with sexual favors in exchange for his representation of Osborne. [Record No. 220-1] The purported-affidavit also suggests that Williams was a possible government witness against Thompson, and that Scoville was aware of this fact. [*Id.*] The evidentiary hearing revealed that the affidavit was both substantially false, and that it was never actually sworn to by Williams, nor was it notarized in her presence.

---

court charge was dismissed, and Scoville no longer represented Osborne. [Record No. 255 at 3] During Osborne's initial appearance and arraignment on August 28, 2013, attorney Douglas Benge was appointed to represent him. [Record No. 40]

Osborne testified at the hearing. When pressed on whether he had an agreement (or even so much as a conversation) with Scoville regarding offering sex with Williams in exchange for a fee waiver, Osborne answered "No." Under cross-examination by the United States, Osborne testified as follows:

> Q. … Did [Warren Scoville] ever suggest to you that he have sex with Brook Williams in exchange for representing you in legal proceedings?
> A. I mean, not in front of me, no.
> Q. That's my question to you. So not in front of you?
> A. Yes.
> Q. Would you have welcomed that in order to save some money?
> A. Well, I mean, in the beginning of this, you know, I mean -- you know, I mean, me, if I could have, you know, had sex with some big fat chick to save myself some money, I sure would. I can't say that my girlfriend wouldn't have. I wasn't there, you know, at that time.
> Q. Would you have pimped out your girlfriend in order to get a good lawyer, one of the best lawyers in town?
> A. I mean, if it kept me out of prison, I mean, sure. Why not?
> Q. You would have pimped her out?
> A. Sure. Why not?
> Q. Okay. Did you?
> A. I mean, I was locked up in state. For all I know --
> Q. No, did you? Did you have a conversation with Warren Scoville where you said, hey, if you have sex with my girlfriend, will you waive your fee?
> A. No.

[Evid. Hrg. Tr. 03/23/17 at 66-67] Despite Osborne's attempts to equivocate, he testified plainly that he had no such fee agreement with Scoville, nor had one ever been discussed, nor had he any knowledge of a relationship between Scoville and Williams.

Williams testified the following day. She stated, under oath, that no such illicit fee agreement existed, nor was it ever discussed. [Evid. Hrg. Tr. 03/24/17 at 7-15] Nor had Scoville ever threaten to take her to the "islands" with him. [*Id*. at 5] Further, Williams testified under oath that the only reason she signed the document (filed as an affidavit) is

- 11 -

because she was intimidated to do so by two of Thompson's friends, whom she named. [Evid. Hrg. Tr. 03/24/17 at 7-10] They brought the document to her home, and pressured her to sign it. [*Id.*] Williams never swore to the contents of the statement, nor did she sign it in the presence of the notary. [*Id.* at 14] Under direct examination by Thompson's counsel, Williams answered as follows:

> Q. So the bottom line is, you're telling me everything in this affidavit is a lie?
> A. I'm telling you that there was never a conversation between me and Warren Scoville that instead of make a payment arrangement for a separate case, for me to perform sexual favors. No, sir, that never happened. Yes, was John Thompson in his office at the same time as me? Yeah. But --
> Q. And I just want to make sure you understand. I'm not insinuating that you went on a trip with this individual. I'm simply trying to ask, did he propose to take a trip with you? Did he ask you to take a trip with him?
> A. No, sir.
> …
> Q. So just to pin it down then, where you say that he offered to take the case for sexual favors, where you signed off on that, you were lying when you signed that, correct?
> A. Yeah. I was intimidated, and I did sign that when the two men come to my home, yes. No, John Thompson never walked in on a conversation where Warren Scoville was asking me to perform any sexual favors as his payment for lawyer fees. That's what I'm saying.

[Evid. Hrg. Tr. 03/24/17 at 10-11] Williams later discussed installment payments made to Scoville. [*Id.* at 11]

Williams's and Osborne's testimony that no such fee agreement existed -- or was even discussed -- fatally undermines Thompson's claims and testimony to the contrary. Moreover, while testifying, Thompson recanted the assertion made in his motion that he "once caught direct sight of counsel and Ms. Williams engaging in sexual activity in Counsel's office." [*Compare* Record No. 202 at 5 *with* Evid. Hrg. Tr. 03/23/17 at 36-37] This concession is also crucially important. Apart from Thompson's speculation, no

evidence was presented to support the allegation that Williams had any type of physical relationship with Scoville.

Finally, the Assistant United States Attorney prosecuting the underlying case stated that Williams would not have been called as a witness against Thompson. [Evid. Hrg. Tr. 03/23/17 at 54-56] He stated that he did not believe Williams had admissible evidence to offer regrading Thompson, and that she would otherwise be unnecessary because of the availability of the cooperating co-defendant, William Scalf. [*Id.* at 55] When questioned by the United States on cross-examination, Williams answered as follows:

> Q. If this matter had gone to trial with Mr. Thompson, would you have been in a position to be a witness to testify as to what type of drugs it was that Mr. Thompson was selling and the quantity of drugs that he was selling?
> A. No, sir.

[Evid. Hrg. Tr. 03/24/17 at 14]

To summarize: there is conclusive evidence that no illicit fee agreement existed or was ever discussed. Nor had Scoville ever threatened/suggested taking Williams on vacation with him. There is no evidence to support that any inappropriate relationship ever existed between Williams and Scoville. And while Williams did provide a statement to the police that implicated Thompson, there is little evidence to support that she actually would have been called as a witness.

Following *Mickens*, it is unclear whether the *Cuyler* standard applies to cases involving, "all kinds of alleged attorney ethical conflicts," such as "romantic 'entanglement[s]'" or otherwise. 535 U.S. at 174. Before *Mickens* cast such applications into doubt, other courts applied *Cuyler* and found actual adverse-impact conflicts where,

for example, defense counsel was in an ongoing intimate relationship with a government witness. *See, e.g., United States v. Harris*, 846 F. Supp. 121, 128 (D.D.C. 1994) (finding an actual conflict where "[d]uring the entire period" that counsel was representing the defendant, counsel "was involved in an longstanding, adulterous, intimate affair with [a testifying police officer].").

Thompson attempts to establish a meritorious claim based on cases such as *Harris*. He has gone to great lengths to do so, including obtaining a coerced affidavit. But even if *Harris* is still good law on the application of *Cuyler*, Thompson's evidentiary basis for this claim has dissolved. Because he has no evidence to support his claim of counsel's ethical quandary, he has no basis for showing an actual conflict and, therefore, cannot escape the *Stickland* requirement of showing prejudice. *See Mickens*, 535 U.S. at 166 (discussing exceptions to *Strickland's* prejudice requirement); *Moss v. United States*, 323 F.3d 445, 455 (6th Cir. 2003) (same).

There remains one scenario that must be discussed. That is, whether Williams *could have been* a government's witness. Even if no illicit relationship existed, Scoville still could have had a conflict based on his concurrent-then-successive representation of Thompson and representation of the boyfriend of a possible witness against Thompson. While the Assistant United States Attorney stated on the record that Williams would not have been called as a witness against Thompson, the fact remains that she filed a police report detrimental to his interest.

In *Jalowiec v. Bradshaw*, 657 F.3d 293, 314 (6th Cir. 2011), the Sixth Circuit found *no* prejudice or adverse effect where counsel *actually* cross-examined a government's witness who was a previous client. And this case is two-steps removed from the *Jalowiec* scenario. Here, it is not the *former client* who would testify, but the *girlfriend of the former client*. Perhaps more importantly, no testimony ever took place. Thompson's allegation is actually that Scoville encouraged him to plead guilty so that Scoville would not face the possibility of cross-examining someone with whom he was in an illicit relationship. Absent the illicit-relationship theory, Thompson has not argued how he was actually prejudiced (or adversely affected) by the possibility that his counsel *may* have to cross-examine the girlfriend of a former client. With *Jalowiec* finding no conflict of interest in a more direct-conflict scenario, it is difficult to imagine why counsel would compel his client to plead guilty on this basis.

c. **Newly-Asserted Claim**

Thompson objects to the Magistrate Judge's "decision to 'ignore' the Defendant's testimony regarding Scoville's unethical conduct and advice." [*See* Record No. 256 at 2 (emphasis added).] He points to his testimony that Scoville advised him to lie about the pill count during the evidentiary hearing which, he argues, was "unethical and constitutionally ineffective." [*Id.*; Evid. Hrg. Tr. 03/23/17 at 56] Magistrate Judge Wehrman hardly ignored Thompson's testimony. Instead, he gave it the credibility it deserved.

Pointing out the claim's curious absence from Thompson's motion or subsequent filings, Magistrate Judge Wehrman "[found] it improbable that Thompson could have

In *Jalowiec v. Bradshaw*, 657 F.3d 293, 314 (6th Cir. 2011), the Sixth Circuit found *no* prejudice or adverse effect where counsel *actually* cross-examined a government's witness who was a previous client. And this case is two-steps removed from the *Jalowiec* scenario. Here, it is not the *former client* who would testify, but the *girlfriend of the former client*. Perhaps more importantly, no testimony ever took place. Thompson's allegation is actually that Scoville encouraged him to plead guilty so that Scoville would not face the possibility of cross-examining someone with whom he was in an illicit relationship. Absent the illicit-relationship theory, Thompson has not argued how he was actually prejudiced (or adversely affected) by the possibility that his counsel *may* have to cross-examine the girlfriend of a former client. With *Jalowiec* finding no conflict of interest in a more direct-conflict scenario, it is difficult to imagine why counsel would compel his client to plead guilty on this basis.

c. **Newly-Asserted Claim**

Thompson objects to the Magistrate Judge's "decision to 'ignore' the Defendant's testimony regarding Scoville's unethical conduct and advice." [*See* Record No. 256 at 2 (emphasis added).] He points to his testimony that Scoville advised him to lie about the pill count during the evidentiary hearing which, he argues, was "unethical and constitutionally ineffective." [*Id.*; Evid. Hrg. Tr. 03/23/17 at 56] Magistrate Judge Wehrman hardly ignored Thompson's testimony. Instead, he gave it the credibility it deserved.

Pointing out the claim's curious absence from Thompson's motion or subsequent filings, Magistrate Judge Wehrman "[found] it improbable that Thompson could have

simply forgotten or omitted a fact as potentially consequential as his attorney directing him to lie on the stand." [Record No. 255 at n.9] Thompson's demeanor on the stand, coupled with his (admittedly) false previous testimony and the established falsification of an affidavit, resulted in Magistrate Judge Wehrman's decision to give no credence to the assertion. [*Id.*] Again, the undersigned agrees.

As an initial matter, this ineffective assistance claim is untimely. In 1996 Congress passed the "Antiterrorism and Effective Death Penalty Act" ("AEDPA"). Among other things, AEDPA set forth a one-year statute of limitations for bringing claims under 28 U.S.C. § 2255, in part to quell endless post-conviction litigation. This case demonstrates AEDPA's wisdom in this regard. Thompson cannot compel the court to adjudicate the merits of a *brand new allegation* by raising it in the midst of an evidentiary hearing on a previous, factually distinct allegation, especially where, as here, the claim is raised for the first time after the one-year statute of limitations has expired (and well after his trial counsel has expired).

The procedure for amending a timely § 2255 petition is to file a motion to amend under Rule 15(c) of the Federal Rules of Civil Procedure. Thompson made no such motion, and it would likely fail to meet the amendment standard. Such amendment is only permitted when it "relates back" to the original motion. The claim that Scoville told Thompson to lie relates to the claims in his earlier motion, at least in as much as it argues ineffectiveness, including in relations to the evidentiary hearing. But that alone is not enough. Instead, the new claim must share the "same core facts as the timely filed claims."

*Mayle v. Felix*, 545 U.S. 644, 657 (2005); *see also Wiedbrauk v. Lavigne*, 174 F. App'x 993, 1002 (6th Cir. 2006). Thompson asserted as the fourth claim in his 2255 motion that "Defense Counsel failed to prepare Movant for sentencing and evidentiary testimony. This Honorable Court even commented at the sentencing hearing that the Movant's testimony 'wasn't convincing to the Court, and his testimony was not logical.'" [Record No. 202 at 8-9] Advising someone to take the stand and lie is factually distinct from failing to prepare someone to testify.[9] Far from being the "same core facts," Thompson's new claim raises a very distinct factual allegation. So much so that, as Magistrate Judge Wehrman concluded, it is highly improbable Thompson could have simply forgotten to raise it.

Because Thompson's new claim lacks credibility and is untimely, it will be denied.

### d.  Remaining Claims

Thompsons's 2255 motion asserts four non-conflict-of-interest-based theories of ineffective assistance. He argues that counsel failed to investigate "charges, witnesses, co-defendants, and evidence" (Count II), that counsel "failed to adequately challenge some, if

---

[9]  Moreover, Count II of Thompson's original motion alleges that counsel failed to investigate the confidential informant who testified against him, and that person's motive to *exaggerate* the drug quantities. [*Id.* at 6-7] But Thompson now acknowledges that the confidential informant's testimony was accurate. He testified that approximately 10,000 or so pills were involved . [Evid. Hrg. Tr. 03/23/17 at 11-12 ("I give [Scoville] the truth. . . . [p]robably 10,000 or so")] Thompson's acknowledgement that he was responsible for "10,000" or so pills validates the Court's factual finding that Scalf delivered to him a total of 8,750 oxycodone pills. [*See* Record No. 104 at 5] Having admitted to the accuracy of Scalf's testimony, Thompson cannot retain an ineffective assistance challenge for failure to controvert Scalf's testimony.

- 17 -

not all of the evidence in relation to the drug quantities, as well as the credibility of the CI" (Count III), that counsel failed to prepare movant for his testimony and sentencing hearing (Count IV), that counsel's "emotionally disturbed state prevented him from effectively representing Movant" (Count V), and finally, he argues for cumulative error (Count VI).[10] [Record No. 202]

Magistrate Judge Wehrman found most of these claims "too generic and conclusory to warrant §2255 relief." [Record No. 217 at 4] But regarding Scoville's advocacy, the initial Report and Recommendation notes that "counsel vigorously cross-examined co-defendant William Scalf at the evidentiary hearing and also presented defendant's own testimony at that hearing [Record No. 153], filed a sentencing memorandum asking for a lenient sentence for defendant [Record No. 116], filed extensive objections to the PSR [Record No. 145 at 27-29] and orally argued on defendant's behalf at sentencing. [Record No. 154]." [*Id.* at 5]

Thompson's objection to the initial Report and Recommendation challenges only the findings with respect to the conflict of interest. [Record No. 220] Thompson has therefore waived the right to review of the remaining claims. *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) ("As long as a party was properly informed of the consequences of failing to object, the party waives subsequent review by the district court and appeal to this court if it fails to file an objection.") Despite Thompson's waiver (and his fair warning

---

[10] Thompson also alleges, as part of Count I, that he was "forced [] to sign [a] plea agreement." [Record No. 202 at 5] There was no written plea agreement. [Record No. 95]

of the consequences) it is clear that Thompson's remaining claims are without merit. To the extent Thompson argues that he was prejudiced by Scoville's failure to contravene the evidence of drug quantity, Scoville in fact did so, and Thompson now admits that the testimony was *accurate*. [*See* Evid. Hrg. Tr. 03/23/17 at 11-12; Record No. 104] In light of that concession, it is far from clear what any further investigation would have revealed, and there is simply no basis for cumulative error. Thompson has made no credible allegations of error on the part of Scoville, nor has he shown that, but for those errors, he would have received a different sentence. *Strickland v. Washington*, 466 U.S. 668, 694 (1984)

### III.

The factual foundation for Thompson's conflict of interest claim was fatally undermined during the evidentiary hearing. His own testimony regarding an illicit fee agreement was directly contradicted by two of the three individuals allegedly party to the agreement. Osborne even admitted that he would have been *willing to enter into an illicit agreement*, but nonetheless, it was never even discussed. [Evid. Hrg. Tr. 03/23/17 at 66-67] Thompson's newly-raised assertion that counsel instructed him to lie is untimely raised and otherwise lacks credibility. Finally, Thompson has not only waived the remaining claims by failing to object, but their merit has been undermined, at least in substantial part, by his own admission about the accuracy of drug quantities testified presented against him. Accordingly, his § 2255 motion will be denied.

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 Proceedings, and 28 U.S.C. § 2253(c), the Court will deny a certificate of appealability. Thompson has failed to show that reasonable jurists would find this court's "assessment of the constitutional claims debatable or wrong" or that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Being sufficiently advised, it is hereby

**ORDERED** as follows:

1. The Magistrate Judge's September 29, 2016, Report and Recommendation [Record No. 217] as amended by the March 30, 2017, Report and Recommendation [Record No. 255] is **ADOPTED** and **INCORPORATED** by reference.

2. Movant John Thompson's motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255 [Record No. 202] is **DENIED**.

This 3rd day of August, 2017.



Signed By:
*Danny C. Reeves* DCR
United States District Judge